514 S.E.2d 622

**CITY OF SOUTH CHARLESTON,**
Appellant,

v.

**The WEST VIRGINIA PUBLIC SERVICE COMMISSION** and Green Valley Community Public Service District, Appellees.

No. 25333.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 1999.

Decided March 12, 1999.

Amy J. Haynie, Esq., South Charleston, West Virginia, T.D. Kauffelt, Esq., Kauffelt & Kauffelt, Charleston, West Virginia, Attorneys for Appellant.

James V. Kelsh, Esq., Charleston, West Virginia, Attorney for Appellee Public Service Commission.

Robert R. Rodecker, Esq., Charleston, West Virginia, Attorney for Appellee Green Valley Service District.

James W. Withrow, Vaughn & Withrow, Charleston, West Virginia, Attorney for Amicus Curiae West Virginia Municipal League, Inc.

PER CURIAM:

The City of South Charleston ("City") appeals a final order of the Public Service Commission ("Commission") dated May 21, 1998. The Commission's order requires the City to continue to provide billing, collection and maintenance services for the sewage system of the Green Valley Community Public Service District ("District"). The Commission's order additionally alters the rates and charges for the City's residential, commercial and industrial customers. The City alleges on appeal that the Commission committed two errors: (1) that the Commission exceed-

ed its jurisdiction when it required the City to continue to provide billing, collection and maintenance services to the District's customers after the service contract between the City and the District expired; and (2) that the Commission exceeded its jurisdiction by altering the sewage rates of the City's residential, industrial and commercial customers when no customer affected by those rates filed a timely protest. Following our review of the record, we find no error and affirm the final order of the Commission.

## I.

### Facts and Background

The City of South Charleston operates a sewage collection and treatment system. The Green Valley Service District is a public service district located outside of the City limits of the City of South Charleston. On September 4, 1979, the City and the District entered into a contract whereby the City would provide the transportation and treatment of the District's sewage, and perform the billing, collection and maintenance services related to the operation of the District's sewage system. The contract stated that it would remain in effect for 40 years, and did not have a fixed rate, but provided that the services would be performed on a cost-of-service basis. The contract was filed with the Commission, but was never formally reviewed and approved by the Commission.

A new contract was entered into between the City and the District on September 30, 1982. This second contract was similar to the 1979 contract, with two exceptions: the term of the contract was for only 15 years, and a fixed rate was established at $1.57 per thousand gallons of wastewater. This contract was not submitted to the Commission for its approval.[1]

In November of 1995 the City notified the District that it did not intend to renew the contract upon its termination in 1997. The City did indicate that it would be willing to continue to transport and treat the District's

sewage after the expiration of the contract but the City stated that it would cease to provide billing, collection and maintenance services to the District.

During the summer of 1996, the City began negotiating with the District, regarding the City's potential acquisition of the District's sewage system. On December 17, 1996, the City and the District filed a notice seeking the consent of the Commission for the City's acquisition of the system. However, on February 11, 1997, the City notified the Commission that the City no longer wished to acquire the District's system. The City apparently took this action without notifying the District.

On August 7, 1997, the City adopted an ordinance establishing a transportation and treatment rate of $1.71 per thousand gallons for customers of the District. This rate was to become effective on October 1, 1997.

On August 27, 1997, the District filed a complaint against the City with the Commission.[2] The District stated in the complaint that after the City announced it would no longer provide the billing, collection and maintenance services for the District's customers, the District had attempted to secure a contractor to provide those services. However, the District had ceased trying to obtain a contractor when the City indicated that it wished to acquire the District's system. The District renewed its efforts to locate a contractor only after the City withdrew its request for the consent of the Commission to acquire the system. In the complaint, the District requested that the Commission exercise its regulatory authority and order the City to continue to provide billing, collection and maintenance services until another solution could be found.

On September 5, 1997, the District filed a second complaint against the City with the Commission.[3] In this complaint, the District argued that the 1979 contract, which had a term of 40 years, was still in effect. The District further alleged that the proposed

---

1. There is nothing in the record before this Court that would explain why the contract was not submitted to the Commission, nor do the parties offer an explanation for this omission.

2. Case No. 97–1085–PSD–D–C.

3. Case No. 97–1140–PSD–S–C.

rate of $1.71 per thousand gallons was arbitrary and discriminatory because the City had changed its proposed sewer rate within 6 months from $1.45 to $1.71 per thousand gallons,[4] without performing any cost of service study.[5] The District argued that the new rate had been adopted without Commission approval, and was contrary to both the 1979 and 1982 contracts.[6]

Also on September 5, 1997, the District filed a petition with the Commission pursuant to *W.Va.Code*, 24–2–4b(c)(2) [1994], alleging rate discrimination. The District argued that the new rate was established without a class cost of service study and without proper notice pursuant to *W.Va.Code*, 24–2–4b [1994]. The District alleged that without a cost of service study the new rate would discriminate against the District's customers in favor of the "customers located within the city limits[.]"

The three actions were consolidated and the matter was heard by an administrative law judge ("ALJ"). During the hearing before the ALJ, evidence was offered by the Staff of the Commission and by the District regarding the rates for the District and for the City's residential and industrial customers. Evidence was also offered by the District, tending to show that the District did not have the facilities and staff necessary to perform those tasks that the City sought to discontinue. A recommended decision was rendered on March 13, 1998 and both parties filed exceptions to the recommended order with the Commission.[7] The recommended decision would have permitted the City to discontinue providing billing, collection and maintenance services to the District. The recommended decision also established a new rate for all of the City's residential, commercial and industrial customers.

Following a review of the case, the Commission refused to adopt portions of the recommended order. Instead, the Commission ordered the City to continue to provide billing, collection and maintenance services to the District in addition to the treatment and transportation of the District's wastewater. The Commission's order set the rate for the District's customers at $2.59 per thousand gallons of wastewater and changed the sewage rates for the City's residential, commercial and industrial customers. The City appealed this order to this Court pursuant to *W.Va.Code*, 24–5–1 [1979].[8]

## II.

### *Discussion*

We set forth the standard of review of an order of the Commission in Syllabus Point 1

---

4. This rate was only for the transportation and treatment of the District's sewage.

5. By letter dated February 11, 1997 the City notified the District that it would no longer provide billing, collection and maintenance services but would continue to provide transportation and treatment services at a rate of $1.45 per thousand gallons effective October 1, 1997. However, on August 7, 1997, the City passed an ordinance which established a rate of $1.71 per thousand gallons.

6. Both contracts included the following language: "This agreement is made by the parties hereto subject to the review and approval of the Public Service Commission of the State of West Virginia and likewise all modifications made to this Agreement and pursuant to its terms shall be subject to the same review and approval."

7. The recommended decision provided for the following: (1) that the staff-recommended rates be approved; (2) that those ordinance sections, rates and clauses addressed in the staff's recommended tariff be approved to replace those in the South Charleston Municipal Sewer Ordinances and that the remaining portions of the Ordinance remain as they are; (3) that the City continue to provide the District the general administration, billing and collection, and day-to-day maintenance services that are not related to wastewater treatment and transportation, and that were provided pursuant to the 1982 contract, "until October 1, 1998, at the rate of $.41 [sic] per thousand gallons" of wastewater treated; (4) that the City discontinue billing under its multiple occupancy clause; (5) that the Sanitary Board of the City record its revenues and expenses in accordance with the Uniform System of Accounts, and capture the revenues for each customer class separately; and (6) that the City file revised tariff sheets reflecting its new rates and charges within 10 days of the date the recommended decision becomes final.

8. *W.Va.Code*, 24–5–1 [1979], provides, in part:

Any party feeling aggrieved by the entry of a final order by the commission, affecting him or it, may present a petition in writing to the supreme court of appeals, or to a judge thereof in vacation, within thirty days after the entry of such order, praying for the suspension of such final order.

of *Central West Virginia Refuse, Inc. v. Public Service Commission*, 190 W.Va. 416, 438 S.E.2d 596 (1993), where we held:

> The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.

With this standard in mind, we consider the City's two arguments.

## A.

### Services

■ The City argues that the Commission exceeded its jurisdiction by ordering the City to continue to provide billing, collection and maintenance services to the District. The City contends that because the billing, collection and maintenance services were provided to the District pursuant to a contract that has expired, the Commission does not have the authority to order the City to continue to provide these services. Conversely, both the Commission and the District argue that the Commission does have the authority to order the City to continue to provide these services.

■ In *W.Va.Code*, 24–1–1 [1986],[9] the Legislature delegated to the Commission the "administrative supervision and regulation of all service rendered to the public throughout the whole of the State ." *City of Benwood et al. v. Public Service Commission*, 75 W.Va. 127, 129, 83 S.E. 295, 296 (1914). The Commission is authorized under *W.Va.Code*, 24–2–4b [1994] to regulate the rates and services provided by a municipality acting as a utility. As the Fourth Circuit Court of Appeals stated in *City of Charleston v. Public Service Commission of West Virginia*, 57 F.3d 385 (4th Cir.1995):

> The authority of the PSC to regulate the rates and practices of West Virginia municipalities, when acting as utilities, has existed at least since 1914. The specific power of the PSC to regulate the extension and termination of service by a public utility to its customers is also well established.

57 F.3d at 393 (Citations omitted.)

■ This Court has recognized that the Commission "was created by the Legislature for the purpose of exercising regulatory authority over public utilities. Its function is to require such entities to perform in a manner designed to safeguard the interests of the public and the utilities. Its primary purpose is to serve the interests of the public." Syllabus Point 1, in part, *West Virginia–Citizen Action Group v. Public Service Commission*, 175 W.Va. 39, 330 S.E.2d 849 (1985).

■ A utility may enter into a contract with another utility; however, all contracts made by a utility are subject to review by the Commission. We stated in *Preston County Light & Power Co., v. Renick*, 145 W.Va. 115, 129, 113 S.E.2d 378 (1960):

> [A]ll contracts made by a utility relating to the public service must be deemed to be entered into in contemplation of the exercise by the state of its regulatory power

---

9. *W.Va.Code*, 24–1–1(a) [1986] provides, in part:

(a) It is the purpose and policy of the Legislature in enacting this chapter to confer upon the public service commission of this state the authority and duty to enforce and regulate the practices, services and rates of public utilities in order to:

(1) Ensure fair and prompt regulation of public utilities in the interest of the using and consuming public;

(2) Provide the availability of adequate, economical and reliable utility services throughout the state;

(3) Encourage the well-planned development of utility resources in a manner consistent with state needs and in ways consistent with the productive use of the state's energy resources, such as coal;

(4) Ensure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference, applied in a manner consistent with the purposes and polices set forth in article two-a [§ 24–2A–1 et seq.] of this chapter, and based primarily on the costs of providing these services; [and]

(5) Encourage energy conservation and the effective and efficient management of regulated utility enterprises[.]

whenever the public interest may make it necessary; and when such contracts are the subject of statutory regulation, no contract for service may be made by a public utility except as provided by law, although an otherwise valid contract is binding on the parties to it until a departure from such contract has been directed by competent authority.

*See United Fuel Gas Co. v. Battle,* 153 W.Va. 222, 246–247, 167 S.E.2d 890, 904, *cert. denied,* 396 U.S. 116, 90 S.Ct. 398, 24 L.Ed.2d 309 (1969); *City of Charleston v. Public Service Commission of West Virginia* 57 F.3d 385, 391–392 (4th Cir.1995).

■ As part of its review of a utility contract, the Commission may modify or void any clause in the contract that the Commission determines is adverse to public interest. *Mill Creek Coal & Coke Co. v. Public Service Commission,* 84 W.Va. 662, 100 S.E. 557 (1919) (contract rights must yield to the public welfare when the two conflict); *City of Charleston v. Public Service Commission,* 86 W.Va. 536, 103 S.E. 673 (1920) (the Commission did not unlawfully impair a contract when it annulled a franchise contract granted by a municipality where the provisions of the contract were discriminatory); *City of Charleston v. Public Service Commission,* 57 F.3d 385 (4th Cir.1995) (the Commission may alter rates that are set forth in a contract); *Preston County Light and Power Company v. Renick,* 145 W.Va. 115, 113 S.E.2d 378 (1960) (the Commission has the authority to supervise, regulate, modify or approve a contract between utilities); *Chesapeake & Poto-mac Telephone Company of West Virginia v. City of Morgantown,* 144 W.Va. 149, 107 S.E.2d 489 (1959) (the Commission has the authority to determine whether a city may order the removal of a utility's service following the expiration of a 40–year municipal ordinance).

■ In sum, the "public service commission of this State has authority to supervise, regulate, modify or approve a contract between public utilities subject to its jurisdiction which affects the service rendered to the public or the rate charged for such service." Syllabus Point 2, *Preston County Light & Power Co. v. Renick,* 145 W.Va. 115, 113 S.E.2d 378 (1960).[10]

The City contends that *Benwood–McMechen Water Co. v. City of Wheeling,* 121 W.Va. 373, 4 S.E.2d 300 (1939) should be controlling in this matter.[11] In *Benwood–McMechen,* the City of Wheeling entered into a contract to provide water to a private utility, the Benwood–McMechen Water Company, in an adjoining city. The contract was for an indefinite period of time and could be terminated by either party upon reasonable notice. The contract was submitted to the Commission and approved.

A dispute over rates subsequently occurred between the City of Wheeling and the Benwood–McMechen Water Company. The matter was brought before the Commission and the City of Wheeling requested that it be permitted to discontinue service to the Water Company. The Commission denied Wheel-

**10.** In *State ex rel. City of Wheeling v. Renick,* 145 W.Va. 640, 116 S.E.2d 763 (1960) this Court summarized the authority of the Commission by stating that:

the only limitation upon the power and authority of the public service commission to control the facilities, charges and services of all public service corporations and to hear the complaints of persons entitled to such services is that "the requirements shall not be contrary to law and that they shall be 'just and fair,' 'just and reasonable,' and 'just and proper.'"

145 W.Va. at 651, 116 S.E.2d at 770 (Citations omitted.)

**11.** The City also cites the Public Service Commission case of *Billy Joe Edwards and Columbia Gas of West Virginia Inc.,* 67 ARPSCWV 1231 (1980) in support of its contention that the Commission lacks the authority to require the City to continue

to provide services to the District. *Billy Joe Edwards* was not appealed to this Court and hence is not binding upon us. However, it should be noted that the facts of the *Billy Joe Edwards* case are significantly different from the facts presented to this Court in the present case. In *Billy Joe Edwards,* the Commission sought to require Columbia Gas to assume gas service to residents of a subdivision outside the area the gas company did serve. The Commission determined that it did not have the statutory authority to require Columbia Gas to assume gas service to customers outside the gas company's service area. Because *Billy Joe Edwards* was not appealed, and because the facts of *Billy Joe Edwards* are different than the facts presented in the present case, we conclude that the City's reliance on *Billy Joe Edwards* is not persuasive.

ing's request. On appeal this Court reversed the Commission. We determined in *Benwood–McMechen* that the contract in question did not involve water-consuming customers, but was merely a contract between two utility companies. "It was a contract which, with the consent of the public service commission, they had the right to make, but it was confined to the two utilities and did not extend to the public served by each." 121 W.Va. at 377, 4 S.E.2d at 303.

The City's reliance on *Benwood–McMechen* is misplaced. We specifically held in *Benwood–McMechen* that no public interest was involved, but to the extent that the decision did affect the public, we stated:

[T]he city, having entered into this agreement, and the public being involved . . . may not abruptly terminate the same and discontinue the services thereunder. Under all the circumstances, a reasonable time should be given to enable the Water Company to so adjust its affairs as to give the public within the cities . . . the service to which . . . they are entitled. *What is a reasonable time, under the circumstances of the case, is a matter which the public service commission may properly determine* [.]

*Benwood–McMechen*, 121 W.Va. at 380, 4 S.E.2d at 304.

■ In the present case, the 1982 [12] contract between the City and the District was never submitted to the Commission for its approval. However, *W.Va.Code*, 24–2–12 [1984] requires that all contracts involving public utilities must be approved by the Commission or the contract "shall be void to the extent that the interests of the public in this state are adversely affected[.]" Therefore, any provision of the 1982 contract would be void to the extent that the provision adversely affected the interests of the public.

In the case before us, the Commission made a finding that "[t]he District has no staff of its own, no office facilities, no office equipment, and no expertise in billing, collection of fees and general maintenance . . . [u]nquestionably, the public interest demands that the City continue to provide full service to the District." [13] We have held that an order of the Commission, " 'based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from misapplication of legal principles.' *United Fuel Gas Company v. The Public Service Commission*, 143 W.Va. 33, 99 S.E.2d 1 (1957)." Syllabus Point 5, in part, *Boggs v. Public Service Commission*, 154 W.Va. 146, 174 S.E.2d 331 (1970); Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission*, 180 W.Va. 387, 376 S.E.2d 593 (1988); Syllabus Point 1, *Sexton v. Public Service Commission*, 188 W.Va. 305, 423 S.E.2d 914 (1992).

Given the Commission's authority to alter or modify contracts that the Commission determines are adverse to the public's interest, and the record before us, we find no error in the Commission's order requiring the City to continue to provide billing, collection and maintenance services to the District.

### B.

### *Rate Change*

■ The City argues that the Commission also exceeded its jurisdiction when the Commission ordered the City to alter the rates of the City's residential, commercial and industrial customers when no customer affected by those rates petitioned the Commission for a review of the rates pursuant to *W.Va.Code*, 24–2–4b(c) [1994].[14]

12. The ALJ held that the 1982 contract superseded the 1979 contract and this ruling was not appealed. Consequently, we do not address the 1979 contract in this opinion.

13. Conversely the Commission found that the City would suffer no detriment if it were required to continue the arrangement that had existed between the City and the District. The record demonstrated that the City would not have to hire any additional staff nor purchase additional

equipment if the City was required to continue the service to the District.

14. *W.Va.Code*, 24–2–4b(c) [1994], provides:

(c) The commission shall review and approve or modify such rates upon the filing of a petition within thirty days of the adoption of the ordinance or resolution changing said rates or charges by:

(1) Any customer aggrieved by the changed rates or charges who presents to the commis-

The City concedes that the Legislature has given the Commission the authority to alter utility rates that the Commission finds to be discriminatory, unjust or unreasonable and that *W.Va.Code*, 24–2–4b [1994] specifically grants the Commission the authority to alter rates established for a municipally operated utility. However, the City argues that the rates for a municipally operated utility may only be reviewed by the Commission upon the filing of a petition in accordance with *W.Va.Code*, 24–2–4b(c) [1994]. Subsection (c) provides for a very limited set of circumstances in which a petition may be filed and it provides for a specific set of entities who may protest municipal operated utility rates.[15] The City argues that, in this case, no petition was filed protesting the rates of the City's residential, commercial and industrial customers. Instead, the District filed a petition challenging only the newly established rates for the District. Therefore, the City contends, the Commission had jurisdiction over the newly established rates for the District, but had no jurisdiction over the already existing rates established for the City's residential, commercial and residential customers.

The Commission takes the opposite position and maintains that once a petition is filed pursuant to *W.Va.Code*, 24–2–4b(c) [1994] protesting the rates of a municipally operated utility, the Commission has jurisdiction over all of the municipality's rates and may review these rates in a *de novo* proceeding in accordance with *W.Va.Code*, 24–2–4b(f) [1994].[16]

Generally, "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syllabus Point 1, *Appalachian Power Co. v. State Tax Department of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995). The interpretation of a statute begins with an examination of the statute to determine if the intent of the Legislature is clear. If the Legislature's intent is clear no further inquiry is necessary. Syllabus Point 2, *Appalachian Power Co.* However, if the intent of the Legislature is not clear, we will ordinarily give significant deference to the agency's interpretation of a statute if that interpretation is based on a permissible construction of the statute. We held in Syllabus Point 4 of *Appalachian Power* that:

> If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious.

Through *W.Va.Code*, 24–2–4b [1994], the Legislature granted to the Commission jurisdiction over the rates of a municipally operat-

---

sion a petition signed by not less than twenty-five percent of the customers served by such municipally operated public utility, or twenty-five percent of the membership of the electric, natural gas or telephone cooperative residing within the state; or

(2) Any customer who is served by a municipally operated public utility and who resides outside the corporate limits and who is affected by the change in said rates or charges and who presents to the commission a petition alleging discrimination between customers within and without the municipal boundaries. Said petition shall be accompanied by evidence of discrimination; or

(3) Any customer or group of customers who are affected by said change in rates who reside within the municipal boundaries and who present a petition to the commission alleging discrimination between said customer or

group of customers and other customers of the municipal utility. Said petition shall be accompanied by evidence of discrimination.

15. See, *supra* note 14.

16. *W.Va.Code*, 24–2–4b(f) [1994] provides:

> (f) Upon receipt of a petition for review of the rates under the provisions of subsection (c) of this section, the commission may exercise the power granted to it under the provisions of the section three [§ 24–2–3] of this article. The commission may determine the method by which such rates are reviewed and may grant and conduct a de novo hearing on the matter if the customer, electric, natural gas or telephone cooperative or municipality requests such a hearing.

ed utility. The Commission's jurisdiction to "review and approve or modify [a municipality's] rates" is triggered by the filing of a petition. *W.Va.Code*, 24-2-4b(c) [1994] provides for three separate situations when a petition may be filed.[17] Subsection (c)(2) permits a petition to be filed by any customer who is served by a municipally operated utility, who resides outside the corporate limits of the municipality, and who is affected by a proposed rate change. The statute requires that a petition filed under subsection (c)(2) must allege discrimination[18] between customers within and without the municipal boundaries.[19]

Once a petition is filed, the Commission is directed to conduct a hearing under the provisions of *W.Va.Code*, 24-2-4b(e) and (f) [1994].

Upon receipt of a petition, the Commission is required by *W.Va.Code*, 24-2-4b(e) [1994] to appoint a hearing examiner to review the grievances set forth in the petition. Subsection (e) requires the hearing examiner to "issue an order approving, disapproving or modifying, in whole or in part, the rates imposed by the ... municipally operated public utility[.]" Subsection (e) does not provide that only the protested rates may be altered, but rather explicitly states that the utility's rates may be approved, disapproved or modified by the Commission "in whole or in part."

The Commission may, under *W.Va.Code*, 24-2-4b(f) [1994],[20] exercise the power granted to it in *W.Va.Code*, 24-2-3 [1983], that provides in pertinent part:

> The commission shall have power to enforce, originate, establish, change and promulgate ... rates ... [a]nd whenever the commission shall, after hearing, find any existing rates ... unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the commission shall by an

order fix reasonable rates ... to be followed in the future in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any provision of law[.]

▮▮▮ We do not find language in *W.Va. Code*, 24-2-4b(f) [1994] that limits the Commission's scope of review only to those rates that initiated the petition. Rather, the Commission may, pursuant to *W.Va.Code*, 24-2-3 [1986], originate, establish or change "existing rates" that the Commission finds to be unjust or discriminatory. We held in Syllabus Point 2 of *Central West Virginia Refuse, Inc. v. Public Service Commission of West Virginia*, 190 W.Va. 416, 438 S.E.2d 596 (1993) that:

> W.Va.Code, 24-2-3 (1983), clearly and unambiguously gives the Public Service Commission the power to reduce or increase rates whenever it finds that the existing rate is unjust, unreasonable, insufficient, or unjustly discriminatory or otherwise in violation of any provision of W.Va. Code, 24-1-1, *et seq.*

▮▮▮ We therefore find that once a petition is filed under *W.Va.Code*, 24-2-4b(c) [1994], the Commission may examine both the rates that are directly challenged in the petition and those rates of a municipally operated utility that reasonably impact upon the challenged rates, so that the Commission may fully address any question of discrimination.

In the case before us, the District filed a petition before the Commission alleging rate discrimination in accordance with *W.Va.Code*, 24-2-4b(c)(2) [1994]. Once this petition was filed, the Commission was authorized by *W.Va.Code*, 24-2-4b(e) and (f) to review and modify the City's utility rates and remedy the alleged discrimination. Neither subsection (e) or (f) limited the Commission's scope

---

**17.** See, *supra* note 14.

**18.** *See City of Wheeling v. Public Service Commission*, 199 W.Va. 252, 483 S.E.2d 835 (1997) (*per curiam*) for a discussion on the interpretation of "discrimination" as used in *W.Va.Code*, 24-2-4b(c) [1994].

**19.** The District in their petition filed on September 5, 1997, pursuant to *W.Va.Code*, 24-2-4b(c) [1994], alleged that without a cost of service study, the new rate might "discriminate against the District, in favor of the customers located within the city limits[.]"

**20.** See, *supra* note 16.

of review to the District's newly established rates. Consequently, we find that the Commission did not exceed its jurisdiction in modifying the City's residential, commercial and industrial customer's rates and we affirm that portion of the Commission's order.[21]

### III.

*Conclusion*

Therefore, we conclude that the Commission did not exceed its jurisdiction and that the order of the Commission was proper and is therefore affirmed.

Affirmed.

---

**21.** The City also argues that the Commission may only review and modify the rates of a municipally operated utility when a petition is filed within 30 days of the ordinance changing the rates pursuant to *W.Va.Code,* 24–2–4b [1994]. However-er, the petition that we have found that gave jurisdiction to the Commission to modify the City's rates was filed within 30 days of the District's rates being altered and therefore was in compliance with the statute.